IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM MILLER and NORMA GIBB
MILLER,

                Plaintiffs,

    v.

J-M MANUFACTURING COMPANY, INC.
d.b.a. J-M PIPE COMPANY, INC., a Delaware
corporation; TJS TRUCKING, LLC, a Washington
State limited liability company; and KEVIN L.
TROMBLEY,

                Defendants.

CV-05-1499-ST

OPINION AND ORDER


STEWART, Magistrate Judge:

## INTRODUCTION

On September 30, 2003, plaintiffs, William Miller  ("Mr. Miller") and Norma Gibb

Miller ("Mrs. Miller") (collectively "the Millers"), were injured on I-84 near La Grande, Oregon,

when their motor home struck a piece of plastic sewer pipe that had fallen from a tractor-trailer

driven by Kevin L. Trombley ("Trombley").  The Millers brought this action against Trombley,

1 - OPINION AND ORDER

his employer, TJS Trucking, LLC ("TJS"), and the manufacturer of the pipe, J-M Manufacturing Company, Inc., d.b.a. J-M Pipe Company, Inc. ("J-M"), who also loaded the pipe onto Trombley's truck.  The Millers assert three claims against all defendants:  negligence, negligence *per se*, and loss of consortium.  This court has jurisdiction pursuant to 28 USC § 1332 and venue under 28 USC § 1391(a)(2).  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Defendants have filed a Motion for Partial Summary Judgment (docket # 59) against the Millers' claim for economic damages in excess of amounts actually paid to their medical treatment providers.  For the reasons set forth below, that motion is denied.

## UNDISPUTED FACTS

The following facts are established by the concise statement of material facts filed by defendants in accordance with LR 56.1(a).[1]

After the accident involving their motor home and the sewer pipe on September 30, 2003, the Millers drove into LaGrande and spent the night.  N. Miller Depo., pp. 27, 32-34.  After two days in LaGrande, they continued their trip home to Las Vegas, Nevada, arriving on October 4, 2003.  *Id*.  The Millers did not seek medical treatment at any time while in LaGrande or while en route to Las Vegas.  *Id*, pp. 34-35; W. Miller Depo., p. 46.

After returning to Las Vegas, the Millers contacted their attorney who referred them to a clinic for treatment.  N. Miller Depo., pp. 66-67.  Between October 6, 2003, and March 2004, they each visited a chiropractor recommended by their attorney approximately 45 times.

---

[1]  The Millers failed to filed a response in accordance with LR 56(b), and, therefore, the facts set forth in defendants' concise statement of material facts are deemed admitted.  LR 56(f).

N. Miller Depo., p. 67; W. Miller Depo., pp. 46-47.   Mrs. Miller ultimately had a three-level

instrumented fusion in her lumbar spine in April 2004.  N. Miller Depo., pp. 44-45, 61.

Mr. Miller underwent trials for both a pain pump and a spinal cord stimulator in late 2006 and

ultimately received a permanent spinal cord stimulator in April 2007.  Thalgott Depo., p. 12;

Tiongson Depo., p. 25.

Despite having insurance through the Health Plan of Nevada, Inc. Senior Dimensions

program, the Millers did not consult their health care provider or their regular doctor for

consultation, referral or treatment for their injuries.  N. Miller Depo., pp. 39-40, 67.

Prior to her surgery, Mrs. Miller signed a "Payment Agreement/Grant Lien" with Valley

Hospital Medical Center in Las Vegas ("Valley Hospital").  Her former attorney, Steve Weiss

("Weiss"), was also a party to the agreement.  Tiongson Depo., p. 21; Carlton Decl., Exhibit 5,

pp. 43-45.  This agreement references the September 30, 2003 accident and expressly directs

Weiss to withhold such sums from any settlement or judgment as may be necessary to tender full

payment to Valley Hospital prior to any other disbursement.  The agreement contains no

description of or limitation regarding the type of treatment or services that may be provided and

makes Mrs. Miller personally liable for all amounts that may be billed.  The agreement permits

Valley Hospital to assign its rights under the agreement for an amount less than the cost billed to

Mrs. Miller, but indicates that "the negotiated payment between assignee and Medical Provider

shall not change Patient's financial obligations to assignee under the terms of this Agreement

which is [the] full billed Charges of medical services rendered and Interest . . . ."  Carlton Decl.,

Exhibit 5, p. 44.

At the time Mrs. Miller signed the agreement, Valley Hospital was already a party to a Master Assignment Agreement[2] with Med-Care Solutions ("Med-Care").  Tiongson Depo., pp. 12-13; Carlton Decl., Exhibit 5, pp. 36-39.  Under this agreement, Valley Hospital may assign accounts receivables for a "Qualifying Patient" to Med-Care in exchange for a pre-arranged payment of a set percentage of the total bill.  A "'Qualifying Patient' [meant] only those patients treated by Provider for personal injuries and who [had] executed a Subrogation Contract with the patient and the patient's attorney."  Carlton Decl., Exhibit 5, p. 36.

Med-Care arranged to purchase the accounts receivable for Mrs. Miller's surgery under the Master Assignment Agreement with Valley Hospital before she was admitted, which it confirmed by letter the week before her surgery.  Tiongson Depo., p. 12; Carlton Decl., Exhibit 5, p. 31.  Therefore, at the time Valley Hospital accepted Mrs. Miller as a patient, it knew that the only payment it would receive for her surgery was the amount paid by Med-Care at the discounted, pre-arranged rate pursuant to the Master Assignment Agreement.  Tiongson Depo., p. 13.  Under that agreement, Med-Care paid Valley Hospital a total of $22,324.00 for Mrs. Miller's surgery and then filed a lien on behalf of Valley Hospital for $102,448.00.  Tiongson Depo., pp. 10, 19-20; Carlton Decl., Exhibit 5, pp. 16-30, 40.  Valley Hospital then assigned its lien to Med-Care.  Tiongson Depo., p. 20; Carlton Decl., Exhibit 5, pp. 41-42.

Mr. Miller underwent surgery at Valley Hospital to implant a trial pain pump in October 2006.  Valley Hospital received payment for this service under an agreement with Key Health Medical Solutions of Nevada, Inc. ("Key Health") which was similar to its agreement with Med-

---

[2] The Master Assignment Agreement provided by defendants was executed on May 31, 2005, over a year after the events at issue here.  However, Mr. Tiongson, a representative for Valley Health Systems, testified that the agreement between Med-Care and Valley Hospital  was "substantially similar" to the one provided to this court by defendants.  Tiongson Depo., p. 13.

Care.  Tiongson Depo., pp. 25-28; Carlton Decl., Exhibit 5, pp. 46-63.  Pursuant to this

agreement, Key Health agreed to and did purchase the accounts receivable for Mr. Miller's

surgery before it occurred at an amount established by its contract with Valley Hospital.

Tiongson Depo., pp. 26-28.  Valley Hospital received $3,709.30 in exchange for assigning its

receivable of $10,598.00 to Key Health.  *Id*; Carlton Decl., Exhibit 5, pp. 58-67.

      As a result of these transactions, Valley Hospital received a total of $25,943.30 for the

services rendered to the Millers and has no rights to any additional payment.  The Millers remain

personally liable to Med-Care and Key Health (collectively "medical finance companies") for

the full amounts originally billed, a total of $113,046.00.  The Millers claim $113,046.00 as their

economic damages, but defendants argue that the Millers are only entitled to recover $25,943.30,

a difference of $87,102.70.

## STANDARDS

      FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).

## DISCUSSION

### I.    Failure to Mitigate

To limit the Millers' economic damages, defendants primarily argue that the Millers failed to mitigate their damages.  According to defendants, the method employed by the Millers in obtaining and paying for their medical treatments in this case actually inflated the cost of their medical treatment by more than $87,000.

A prevailing plaintiff in a tort action in Oregon is entitled to recover both non-economic and economic damages.  *See Zehr v. Haugen*, 318 Or 647, 656, 871 P2d 1006, 1011 (1994).  Oregon law defines the term "economic damages," in part, as "objectively verifiable monetary losses including but not limited to *reasonable charges necessarily incurred* for medical, hospital, nursing and rehabilitative services and other health care services . . . ."  ORS 31.710(2)(a) (emphasis added).  This statute comports with the general purpose of compensatory damages in tort cases "which is to put the injured party in the same position that he or she would have occupied had no tort been committed."  *McKeon v. Williams*, 312 Or 322, 329, 822 P2d 699, 702 (1991) (citation omitted).

An injured plaintiff may not, however, take the commission of a tort as a blank check to incur unnecessary damages on the defendant's dime. *See Milton v. Hare*, 130 Or 590, 604, 280 P 511, 516 (1929) ("no one is permitted . . . to so conduct himself as to permit damages unnecessarily to accumulate against him, and then compel some one else to pay the damages") (citations omitted). Rather, plaintiffs must exercise reasonable care and prudence to minimize their losses, a principle known in Oregon as the doctrine of avoidable consequences or, alternatively, the duty to mitigate damages. *Blair v. United Fin. Co.*, 235 Or 89, 91, 383 P2d 72, 73 (1963); *Marr v. Putnam*, 213 Or 17, 29, 321 P2d 1061, 1067-68 (1958). Under this rule, "a plaintiff cannot recover damages for losses that he could have avoided by reasonable conduct on his part." *Nat'l Mortgage Co. v. Robert C. Wyatt, Inc.,* 173 Or App 16, 27, 20 P3d 216, 222 (2001), quoting *Blair*, 235 Or at 91, 383 P2d at 73. Whether a plaintiff could have avoided damages through reasonable conduct is ordinarily, like most reasonableness issues, a question for the jury. Furthermore, the burden of proving that a plaintiff could have avoided losses rests squarely on the defendant. *Zimmerman v. Ausland*, 266 Or 427, 432, 513 P2d 1167, 1169 (1973).

According to defendants, the Millers intentionally failed to mitigate their medical expenses by opting for the most expensive way to pay for their treatment. As outlined above, the Millers eschewed their insurance benefits in favor of using medical liens to pay for their medical treatment. This method of payment was the result of a highly choreographed process in which, in the case of both Mr. and Mrs. Miller's surgeries, Valley Hospital was aware of how much it would ultimately receive before the procedures were ever performed.

Defendants argue that by using this process, the Millers have incurred a total of $113,046.00 in personal liability in exchange for medical services with a value of only $26,033.30. Thus, their argument goes, the Millers' unreasonable choice of using medical liens instead of health insurance resulted in "excess" medical expenses which constitute avoidable losses the Millers seek to pass on to the defendants.

This argument is not persuasive. As defendants admit, the Millers are entitled to recover the objectively verifiable reasonable value of medical services necessarily incurred due to defendants' negligence. ORS 31.710(2)(a). How the Millers ultimately choose to pay for these services is irrelevant and of no concern to defendants so long as these requirements are met.

In this motion defendants admit that they are not challenging the necessity of the services or the reasonableness of the underlying expenses. Instead, they claim to challenge only the "excess" expenses incurred as a result of the payment "scheme."[3] However, by challenging the "excess" amounts the Millers claim for their medical expenses, defendants are necessarily challenging the reasonableness of those expenses. In claiming that the Millers unnecessarily inflated their medical costs, defendants strike at the very heart of the reasonableness of the underlying charges. To make out an avoidable loss defense in this case, defendants must argue that had the Millers elected to receive all treatments through their insurance carrier, the total charges ultimately passed on to them would have been less, *i.e.*, more reasonable.

---

[3] Defendants relate this case to the scheme at issue in *U.S. v. Awand*. *See* Carlton Supp. Decl., Second Superseding Criminal Indictment, *U.S. v. Awand*, 07-CR-0039-LDG-LRL (D Nev 2007). However, defendants have provided no evidence that the payment mechanism at issue here falls within the coordinated conspiracy at issue in *Awand*. Without expounding on all the differences between the facts in this case and those alleged in *Awand*, it suffices to say there is no evidence at this juncture that the Millers' doctors and lawyer conspired to "artificially and fraudulently [inflate] settlements or judgments by performing excessive and aggressive medical procedures at inflated costs without the fully informed consent of the client and patient," as is alleged in *Awand*. Should additional evidence materialize that more closely links the *Awand* scheme and the payment method employed here, this issue may be revisited.

Yet defendants have failed to provide any evidence that the total amounts charged, including the alleged excess, were unreasonable. In fact, the only evidence on that issue indicates that the charges were reasonable as compared with the amounts charged by other facilities in Las Vegas. Tiongson Depo., p. 37. Defendants have failed to provide any evidence tending to show that had the Millers utilized their health insurance instead of medical liens, the total amount for the procedures would have been any less.

Without this evidence, defendants cannot prove that the Millers failed to mitigate their damages. Had the services been provided under their health insurance, the Millers could have recovered the full amount, including any portions written off by the medical provider, which would have resulted in exactly the same amount of economic damages. *Liner v. Bellingham*, Civil No. CV-02-1681-ST, Opinion by Magistrate Judge Stewart, dated August 6, 2003, *cited with approval in Cole v. Builder's Square, Inc.*, 382 F Supp2d 1200, 1201 (D Or 2003).

## II.      The Amount Incurred

Defendants also argue that the Millers never incurred the full $113,046.00 charge they are claiming. Defendants argue that the meaning of "incurred" in ORS 31.710(2)(a) is to "become liable or subject to" and that the Millers never became "liable or subject to" the increased amounts because Valley Hospital agreed to receive a lesser amount prior to performing the Millers' procedures. In support of this interpretation, defendants cite a recent Oregon Court of Appeals opinion interpreting "incurred" in the context of recovering attorney fees under ORS 36.425(4)(b). *Anderson v. Wheeler*, 214 Or App 318, 164 P3d 1194 (2007).

This court rejected defendants' proffered interpretation in *Liner*. Noting that statutory interpretation in Oregon depends heavily on the text and context of the specific statute, *see PGE*

*v. BOLI*, 317 Or 606, 610, 859 P2d 1143, 1145-46 (1993), *Liner* found that "incurred," as used in ORS 31.710(2)(a), must be interpreted in light of the adjective "reasonable," and the adverb "necessarily." Thus, "[t]he most reasonable interpretation of the phrase 'necessarily incurred' is that the 'reasonable charges' were necessary to treat the injuries received." *Liner*, p. 7. Interpreted in context, *Liner* determined that the focus of "necessarily incurred" was the time of treatment, while the focus of "reasonable charges" was the amount billed for that treatment. Defendants cite, and this court can find, no authority subsequent to *Liner* which would compel this court to differently interpret "incurred" in the context of ORS 31.710(2)(a). Following this construction, the Millers may recover damages for their medical bills as long as they necessarily incurred treatment for which they were later billed a reasonable amount.

Alternatively, defendants argue that because Valley Hospital agreed to accept a lesser amount prior to treating the Millers, and never had any expectation of receiving more, this lesser amount represents the actual value of the services incurred by the Millers. This argument was rejected in *Katiuzhinsky v. Perry*, 152 Cal App 4th 1288, 1297-98 (2007), involving facts nearly identical to those at issue in this case. This court finds the reasoning of that case persuasive.

Defendants' primary error is conflating the two agreements at issue here. In the first agreement between the Millers and Valley Hospital, the Millers agreed to be fully responsible for the reasonable value of all medical services performed by Valley Hospital. In the second agreement between Valley Hospital and the medical finance companies, Valley Hospital agreed to sell its accounts receivable and liens from the Millers' treatments to the medical finance companies for a prearranged price. This second agreement is not one for payment of medical services. The underlying charges for the Millers' medical treatments, in fact, have never been

paid.  Instead, rather than attempt to collect the medical bills from the Millers itself, Valley

Hospital sold its rights to collect for a set contractual price.  In exchange for providing

immediate cash to Valley Hospital, the medical finance companies received as consideration

accounts receivable from Valley Hospital worth an amount sufficient to justify the risk they take

that they may never actually collect.

By purchasing the accounts receivable and liens from Valley Hospital, the medical

finance companies are betting that the Millers will prevail in their litigation, or, if they do not,

then they will be able to recover from the Millers directly.  Should the Millers ultimately lose

this case, the medical finance companies risk losing their investment if the Millers are unable to

pay.  The fact that Valley Hospital was willing to take such a substantial discount or that,

conversely, the medical finance companies were only willing to invest a fraction of the value of

the total bills, may speak to their overall assessment of risk in collecting the full amount of

damages, but it does not change the underlying value of the medical procedures received by the

Millers.  *See*, *Katiuzhinsky*, 152 Cal App 4th at 1298 ("The fact that a hospital or doctor, for

administrative or economic convenience, decides to sell a debt to a third party at a discount does

not reduce the value of the services provided in the first place.")

**III.    Collateral Source Rule**

Finally, both parties address the application of the collateral source rule to the payment

made by the medical finance companies in this case.  The collateral source rule, codified at

ORS 31.580, provides that:

> the court may deduct from the amount of damages awarded, before the
> entry of a judgment, the total amount of those collateral benefits other
> than:

11 - OPINION AND ORDER

> (a)    Benefits which the party awarded damages, the person injured or that persons' estate is obligated to repay. . .
>
> (b)    Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; . . .

The collateral source rule reflects the principle that "a negligent defendant is liable for reasonably foreseeable consequential damages attributable to its negligence, and it is generally true that a defendant cannot escape that liability because the injured party is made whole by its own efforts or the efforts of others." *McKee Elec. Co., Inc. v. Carson Oil Co.*, 70 Or App 1, 8, 688 P2d 1360, 1366 (1984), *affirmed*, 301 Or 339, 723 P2d 288 (1986). Therefore, "if an injured party receives some compensation from a source wholly independent of the tortfeasor, such compensation should not be deducted from what he might otherwise recover from the tortfeasor. The evidentiary consequence of this rule is that proof of such payments is generally regarded as inadmissible in view of its potential misuse by the jury." *Reinan v. Pac. Motor Trucking Co.*, 270 Or 208, 213, 527 P2d 256, 259 (1974).

The Millers have received no benefits or compensation from a collateral source. Properly viewed, the transactions between Valley Hospital and the medical finance companies are nothing more than assignment contracts. The Millers remain liable for the full amount of debt. To the extent that they did receive a "benefit" from the payments, that benefit falls within the express language of ORS 31.580(a) as "benefits which the party awarded damages . . . is obligated to repay[,]" which includes the full amount of the Millers' assigned accounts and interest. The assignment contracts did not extinguish the debt the Millers owe to Valley Hospital, but merely substituted the payee. The Millers have not, in full or in part, been made whole by a source collateral to them. Therefore, the collateral source rule does not apply.

12 - OPINION AND ORDER

**<u>ORDER</u>**

To the extent that the Millers remain personally liable for their medical bills, they may claim them as damages.  At trial, defendants may dispute the necessity of the treatment and reasonableness of the charges.  At this point, however, issues of fact remain on these points. Therefore, defendants' motion for partial summary judgment (docket # 59) is DENIED.

DATED this 7th day of February, 2008.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge